# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7791 | **DATE** | 7/22/2002 |
| **CASE TITLE** | Chapman vs. VLM Entertainment Group | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____ .
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] For the reasons set forth on the attached Memorandum Opinion and Order, plaintiff's motion for summary judgment (21-1) is denied; the motion for partial summary judgment by VLM and Take Two (15-1 is granted. The schedule for discovery of damages experts is modified as set forth on the attached order. Expert discovery to close 10/7/02. Status hearing set to 7/30/02 at 9:30 a.m. to discuss the prospects for settlement and to set a trial date.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | JUL 26 2002 | |
| ✓ | Docketing to mail notices. | | |
| | Mail AO 450 form. | | 33 |
| | Copy to judge/magistrate judge. | | |
| OR | courtroom deputy's initials | 02 JUL 25 PM 4:42 | date mailed notice |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ROBERT C. CHAPMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 00 C 7791 |
| | ) |
| VLM ENTERTAINMENT GROUP, INC. | ) |
| a foreign corporation, and TAKE TWO | ) |
| INTERACTIVE SOFTWARE, INC., a | ) |
| foreign corporation | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Plaintiff Robert Chapman, a former officer, director, and shareholder of VLM Entertainment Group, has sued VLM for breach of contract and VLM's current owner Take Two Interactive Software for tortious interference with contract with respect to a Share Purchase Agreement and related Agreements executed by Chapman and VLM. VLM has filed counterclaims alleging that Chapman also breached the Agreements. The case is before the Court on the parties' cross-motions for summary judgment.

## Facts

VLM was established in 1995 by Charles and Patricia Varney and Rick and Rob Chapman for the purpose of distributing video games, video tapes, and computer software throughout the United States. Within a couple of years, Rob Chapman found himself at odds with the other three VLM shareholders, and he initiated discussions regarding his exit from the

business. On September 2, 1999, Chapman and VLM entered into a Share Purchase Agreement whereby Chapman agreed to sell as his stock in the company for a total purchase price of $2,189,000. The first $1,489,000 of the purchase price was paid to Chapman at closing; of the remaining sum, $500,000 was to be paid in accordance with the terms of an Unsecured Promissory Note and $200,000 was to be paid according to a set payment schedule attached to the Agreement. As part of the transaction, Chapman also executed a Confidentiality and Noncompetition Agreement and a Consulting Agreement. In return, VLM agreed to pay Chapman $25,000 for the Noncompetition Agreement and $112,500 for the Consulting Agreement. These additional payments were to be made in four installments at six month intervals following the date of closing.

In December 2000, Take Two acquired all of the stock of VLM, and VLM became its wholly-owned subsidiary. Thereafter, Take Two stopped paying Chapman; the amount still outstanding exceeds $768,750, which Chapman argues became due when Take Two purchased VLM. The defendants assert that they need not pay the remaining sums because Chapman breached the Noncompetition Agreement and Consulting Agreement by personally guaranteeing and repaying a portion of a $1,000,000 loan made to Microware Distributing, allegedly a competitor of VLM.

Microware was a business established by Glenn Rockwood, a friend of Chapman and the other stockholders of VLM. From its inception in 1984 until its dissolution in 2001, Microware was in the business of distributing video games. In 1999, Rockwood restructured Microware, converting it to a limited liability company and creating two new entities – Vision Play, L.L.C. and Vatical Entertainment, L.L.C. Vision Play was formed as a holding company

with Vatical and Microware as its subsidiaries.

## Discussion

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). This case involves whether Chapman or VLM, or both, breached the Share Purchase Agreement and other Agreements. Issues of contract interpretation are ordinarily questions of law for the Court. *Bourke v. Dun & Bradstreet Corporation*, 159 F.3d 1032, 1036 (7th Cir. 1998). "If a contract is unambiguous, by definition no material issues of fact exist regarding the contract's interpretation; that interpretation is a question of law for the court. But if the contract is ambiguous, the contract's meaning is a question for the trier of fact." *Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Products, Inc.*, 212 F.3d 373, 377, n.1 (7th Cir. 2000) (quoting *Metalex Corp. v. Uniden Corp. of America*, 863 F.2d 1331, 1333 (7th Cir. 1988)).

Chapman alleges in count 1 of his complaint that VLM breached the Share Purchase Agreement by failing to pay the amounts due and owing to him. In count 2, he asserts a claim for anticipatory breach of contract for the amounts that are due in the future. Count 3 purports to state a claim for tortious interference against Take Two. VLM does not dispute that it failed to pay Chapman certain installments. Instead, VLM claims that Chapman breached his non-compete covenants and that this breach excuses VLM's obligation to pay. Because there is no dispute that VLM failed to pay, we begin with its justification for that failure: Chapman's alleged breach.

3

**I. *Chapman's Breach of the Noncompetition Agreement and Consulting Agreement***

In its counterclaim, VLM alleges that Chapman breached both the Noncompetition Agreement (count 1) and the Consulting Agreement (count 2) when he personally guaranteed and repaid a portion of a $1,000,000 loan that had been made to one of VLM's competitors, Microware. In support of its argument, VLM points to substantially similar language in the two Agreements:

> Covenant Not to Compete. From the date of this Agreement until the second anniversary of the date of this Agreement ... Covenantor shall not, directly or indirectly, except on behalf of Seller:
>
> a. Engage, invest, participate or hold an interest in the Business or any business competing with the Business in the Territory; or
>
> b. Have any interest in, own, manage, operate, control, be connected with as a stockholder ... joint venturer, officer, director, agent, lender, representative, partner, employee or consultant, or otherwise engage or invest or participate in or provide services to any business that shall compete with the Business as conducted by [VLM] at any time on or prior to the date hereof...;

Noncompetition Agreement, ¶ 1a, 1b; *see also* Consulting Agreement, ¶ 8.

In March 2000, Microware's owner, Glenn Rockwood, encountered a cash flow problem. Rockwood sought Chapman's assistance in securing financing, and Chapman referred him to Douglas Gerrard of Deere Park Capital, who agreed to loan Rockwood $1,000,000. As a condition of making the loan, Gerrard also obtained Chapman's personal guarantee that the loan would be repaid. According to Chapman, it was his understanding that the loan was intended for Vatical – not Microware. However, the loan was ultimately issued in the name of Microware, which had difficulty making the monthly payments. As a result, Chapman was forced to pay a sizeable portion of Microware's debt, an amount which Rockwood allegedly is repaying to him.

4

VLM argues that Chapman's dealings with Microware violate the Noncompetition and Consulting Agreements. The Agreements unambiguously provide that for a term of two years, Chapman may not "directly or indirectly" invest in, have any interest it, act as a lender for, participate in, or provide any services to any business that competes with VLM. Chapman does not dispute that he guaranteed the loan and paid some of the debt, nor does he contend in response to defendants' motion that providing such services to a competitor would constitute a breach of the Agreements. In support of his argument that a breach did not occur, Chapman instead argues that (1) it was his understanding that Vatical, not Microware, was obtaining the loan and Vatical does not "compete" with VLM; (2) the funds were actually used for Vatical, not Microware; and (3) Microware was only a "friendly" competitor of VLM. None of these arguments save Chapman from a finding that he breached the Agreements.

With respect to the first argument, Chapman concedes that the loan was made in the name of Microware; he argues, however, that he thought it was to be for Vatical. As an initial matter, this contention is suspect, as the guaranty Chapman signed clearly indicates that the lendee is Microware. *See* Defendants' Motion for Partial Summary Judgment, Exhibit N. But in any event, as the signatory to the Noncompetition Agreement, the onus was on Chapman to make sure that the loan he guaranteed was actually for Vatical and that his actions did not run afoul of his contractual obligations. Chapman attempts to explain away this problem by asserting that designating Microware as the lendee instead of Vatical was only a formality to assuage the lender's concern about collecting the loan: "the reason for documenting the loan [in the name of Microware] was that Microware had a longer history of operation and was a financially stable entity, whereas Vatical was a less mature organization that had never previously been profitable."

5

Plaintiff's Memorandum in Support of Summary Judgment at 5. Though this may be true, these assertions do nothing to change the fact that Chapman assisted in, and guaranteed, a loan for Microware, then paid off a significant portion of the loan on Microware's behalf.

Chapman next argues that notwithstanding the name on the loan papers, the funds were actually used for Vatical. This argument is easily dispensed with, as Chapman also concedes that some portion of the loan proceeds "were used to pay various and sundry expenses of Microware." Plaintiff's Memorandum in Support of Summary Judgment at 5. Chapman finally argues that Microware was a "friendly" competitor and that providing services to it therefore does not violate the Agreements. Putting aside VLM's evidence that by the time of the loan, Microware was no longer a friendly competitor, the plain language of the Agreement does not support Chapman's argument. Nowhere does the Agreement qualify the term "competitor" to include only those who are actively hostile to VLM, and we decline to read that interpretation into the Agreement. *See Brooklyn Bagel*, 212 F.3d at 373 (contract is interpreted according to its plain meaning); *Bourke,* 159 F.3d at 1036 (when no ambiguity exists, contract is interpreted based on its plain language).

Accordingly, we conclude that Chapman breached the Noncompetition and Consulting Agreements. VLM moved for summary judgment only on the issue of liability – not damages. Chapman, however, attempts to obtain summary judgment on VLM's damages claims. He asserts that even if he is found to have breached the Agreements, "VLM has failed to marshal competent evidence of any resulting damages." Plaintiff's Memorandum in Support of Summary Judgment at 16. But VLM has offered evidence that, due to Chapman's assistance to Microware, VLM lost the opportunity to acquire the company. *See* Defendants' Reply in Support of

6

Summary Judgment at 15. This evidence, although disputed by Chapman, is sufficient to preclude summary judgment on the issue of damages.

Chapman additionally argues that liquidated damages clauses in the Noncompetition and Consulting Agreements which permit VLM to retain any unpaid installments in the event of Chapman's breach limit the damages that VLM can recover. However, the same provisions also make clear that VLM is not limited to that remedy. Accordingly, we deny Chapman's request for summary judgment on the issue of damages on VLM's counterclaim.

## II. *Chapman's Claims for Breach and Anticipatory Breach*

Counts 1 and 2 of Chapman's complaint are based on VLM's failure to pay Chapman the remaining installment payments owed. It is undisputed that VLM did not make and does not intend to make the remaining payments specified in the parties' Agreements. Rather, VLM argues that its obligation was discharged due to Chapman's breach of the Noncompetition and Consulting Agreements.

In response, Chapman first argues that even if he did breach the Agreements, the breach was not material and thus VLM's refusal to pay him is unjustified. "In general, contractual terms are presumed to represent independent promises rather than conditions." *Sahadi v. Continental Illinois National Bank and Trust Company of Chicago*, 706 F.2d 193, 198 (7th Cir. 1983) (citations omitted). However, a "'material' breach of a contract provision by one party will justify non-performance by the other party." *Id.* at 196 (citations omitted). Accordingly, if Chapman's breach is shown to be material, VLM may be justified in retaining the remaining payments. *See, e.g., In re Krueger*, 192 F.3d 733, 741-42 (7th Cir. 1999) (material

7

failure of performance by one party discharges the duty of the other to perform) (citing Restatement of Contracts ¶¶ 397, 274; *Eager v. Berke*, 11 Ill.2d 50, 142 N.E.2d 36 (1957)). If Chapman's breach is deemed not material, VLM would be in breach of the Agreements for failing to pay Chapman the sums owed, although VLM still would be entitled to seek damages for Chapman's breach.

The issue of materiality is not so easily solved, however. As the Seventh Circuit asserted in *Sahadi*, "the determination of 'materiality' is a complicated question of fact" generally unsuitable for summary judgment. The issue involves an inquiry into whether (1) the breach defeated the bargained-for objective of the parties or caused disproportionate prejudice; (2) custom and usage dictates that the breach is material; and (3) allowing the non-breaching party to refuse performance will create an unreasonable or unfair advantage. *Sahadi*, 706 F.2d at 196.

At this point, we cannot determine as a matter of law whether Chapman's breach was material. Among other things, Chapman argues that his breach did not compromise VLM's business position and that it had no discernable effect on VLM's business; the defendants disagree. The bottom line is that the parties genuinely dispute the purpose of the noncompete clause, the significance of its breach, and its alleged impact on VLM. Accordingly, we deny Chapman's motion for summary judgment on this basis.

Chapman further argues that even if he breached the Noncompete and Consulting Agreements, VLM had no right to withhold its other payments, save those due under the Unsecured Promissory Note, which expressly provides VLM a right of set-off in the event of Chapman's breach. However, the parties genuinely dispute the relationship between the various

8

Agreements, and we thus cannot determine as a matter of law whether a material breach of one Agreement would excuse performance for all.

Chapman finally argues that VLM waived its right to object to his breach by making one installment payment to Chapman in September 2000. Chapman is essentially arguing that VLM's alleged waiver with respect to the September 2000 installment operates as a continuing waiver that would bar any subsequent attempts by VLM to object to Chapman's breach and to refuse to pay future installments. Chapman's argument is without merit because the parties' Agreements contain non-waiver provisions that expressly states that a waiver in one instance shall not constitute a "continuing" waiver. *See, e.g.*, Noncompetition Agreement, ¶ 7 ("[n]o waiver of any provision of this Agreement shall constitute ... a continuing waiver unless otherwise expressly provided"). Although VLM's payment of the September installment may have waived its ability to recover that payment, it does not waive any subsequent objections by VLM to Chapman's conduct.

### III. *Chapman's Claim for Tortious Interference Against Take Two*

In Count 3, Chapman purports to state a claim against Take Two for tortious interference with his contract with VLM. To sustain a claim for tortious interference, Chapman must provide evidence to show (1) the existence of a valid contract between Chapman and VLM; (2) Take Two's awareness of the contract; (3) Take Two's inducement of VLM to breach that contract; and (4) damages. *HPI Health Care Services, Inc., v. Mt. Vernon Hospital, Inc.*, 131 Ill.2d 145, 154-55, 545 N.E.2d 672, 676 (1989). In tortious interference cases, however, a defendant's conduct can be "considered 'privileged' if he acts to preserve a conflicting interest which the law deems to be of equal or greater value than the contractual rights at issue." *Guice v.*

9

*Sentinel Technologies, Inc.*, 294 Ill. App. 3d 97, 106, 689 N.E.2d 355, 362 (1997); *see also HPI Health Care Services*, 131 Ill.2d at 157, 545 N.E.2d at 677 (hospital management companies' duty to hospital shareholders outweighed duty to hospital's contract creditors). To defeat the privilege, a plaintiff must show that the defendant acted with actual malice or that it engaged in conduct antagonistic to the protected interest that is the basis for the privilege. *Guice*, 294 Ill. App. 3d at 106, 689 N.E.2d at 362. In this case, both parties assume that Take Two's conduct was privileged; Chapman attempts to show, however, that Take Two's actions were self-serving and antagonistic to the interests of VLM, thereby destroying the privilege. Specifically, Chapman argues that Take Two was not acting to protect VLM's contract rights, but instead to reduce the amount it paid for VLM after the fact. Take Two disputes Chapman's version of the events. Given these contested issues of fact, Chapman's motion for summary judgment on Count 3 is denied.

## Conclusion

For the reasons stated above, plaintiff Chapman's motion for summary judgment [item # 21-1] is denied; the motion for partial summary judgment by VLM and Take Two [item # 15-1] is granted. The schedule for discovery of damages experts is modified as follows: defendants' Rule 26(a)(2) disclosures are to be made by August 19, 2002; plaintiff's Rule 26(a)(2) disclosures are to be made by September 16, 2000; expert discovery will close on October 7, 2002. A status hearing is set for July 30, 2002 at 9:30 a.m. to discuss the prospects for settlement and to set a trial date.

Dated: July 22, 2002

MATTHEW F. KENNELLY
United States District Judge